KTC:JHK

# M-06- 887

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

FNU LNU,
    also known as "Thavarajah
    Pratheepan," "Raja
    Pratheepan," "Thambi
    Sampras" and "Steeban,"
SURESH SRISKANDARAJAH,
    also known as
    "Waterloo Suresh,"
THIRUKUMARAN SINNATHAMBY,
THIRUKUMARAN SIVASUBRAMANIAM,
MURUGESU VINAYAGAMOORTHY,
    also known as "Dr. Moorthy"
    and "Vinayagamoorthy Murugesu,"
VIJAYSHANTHAR PATPANATHAN,
    also known as "Chandru,"
GASPAR RAJ MARIA PAULIAN,
    also known as "Father Gaspar
    Raj,"
NAMASIVAYA VISWANATHAN,
    also known as "Visvanathan,"
NACHIMUTHU SOCRATES, and
RAMANAN MYLVAGANAM,

        Defendants.

- - - - - - - - - - - - - - - -X

UNDER SEAL

C O M P L A I N T

(18 U.S.C. §§ 2339B, 371,
201 and 3551 et seq.;
50 U.S.C. § 1705(b))

EASTERN DISTRICT OF NEW YORK, SS:

        JAMES J. TARECO, being duly sworn, deposes and states
that he is a Special Agent with the Federal Bureau of
Investigation, duly appointed according to law and acting as
such.

Upon information and belief, in or about and between 2003 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FNU LNU, also known as "Thavarajah Pratheepan," "Raja Pratheepan," "Thambi Sampras" and "Steeban," SURESH SRISKANDARAJAH, also known as "Waterloo Suresh," THIRUKUMARAN SINNATHAMBY, THIRUKUMARAN SIVASUBRAMANIAM, MURUGESU VINAYAGAMOORTHY, also known as "Dr. Moorthy" and "Vinayagamoorthy Murugesu," VIJAYSHANTHAR PATPANATHAN, also known as "Chandru," GASPAR RAJ MARIA PAULIAN, also known as "Father Gaspar Raj," NAMASIVAYA VISWANATHAN, also known as "Visvanathan," NACHIMUTHU SOCRATES and RAMANAN MYLVAGANAM did knowingly and intentionally conspire to provide material support and resources to a foreign terrorist organization, to wit, Liberation Tigers of Tamil Eelam.

(Title 18, United States Code, Sections 2339B(a)(1) and 3551 et seq.)

Upon information and belief, in or about and between 2003 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FNU LNU, also known as "Thavarajah Pratheepan," "Raja Pratheepan," "Thambi Sampras" and "Steeban," MURUGESU VINAYAGAMOORTHY, also known as "Dr. Moorthy" and "Vinayagamoorthy Murugesu," VIJAYSHANTHAR PATPANATHAN, also known as "Chandru," GASPAR RAJ MARIA PAULIAN, also known as "Father Gaspar Raj,"

3

NAMASIVAYA VISWANATHAN, also known as "Visvanathan," and
NACHIMUTHU SOCRATES, did knowingly and intentionally conspire to
bribe public officials, in violation of 18 U.S.C. § 201.

(Title 18, United States Code, Section 371 and 3551 et
seq.)

Upon information and belief, in or about and between
January 2005 and April 2005, both dates being approximate and
inclusive, within the Eastern District of New York and elsewhere,
the defendants SURESH SRISKANDARAJAH, also known as "Waterloo
Suresh," THIRUKUMARAN SINNATHAMBY, THIRUKUMARAN SIVASUBRAMANIAM,
MURUGESU VINAYAGAMOORTHY, also known as "Dr. Moorthy" and
"Vinayagamoorthy Murugesu," and NAMASIVAYA VISWANATHAN, also
known as "Visvanathan," did willfully deal in property of a
specially designated terrorist, to wit, the Liberation Tigers of
Tamil Eelam, in violation of 31 C.F.R. § 595.24.

(Title 50, United States Code, Section 1705(b))

The source of your deponent's information and the
grounds for his belief are as follows:[1]

1.   I have been a Special Agent of the Federal Bureau
of Investigation ("FBI"), for over nine years.  My information
about this investigation comes from my personal participation in
this investigation and a review of e-mails, transcripts of

---

[1]    Because the purpose of this Complaint is to state only
probable cause to arrest, I have not described all the relevant
facts and circumstances of which I am aware.

4

certain consensually recorded meetings and telephone calls,
intercepted telephone communications, financial documents and
other physical and documentary evidence.

### FACTS AND CIRCUMSTANCES

I.  BACKGROUND

2.   Since 1999, FBI agents and other law enforcement
personnel assigned to the Joint Terrorism Task Force ("JTTF")
have been conducting an investigation of individuals and
charitable organizations for violating United States criminal law
by providing material support to the Liberation Tigers of Tamil
Eelam ("LTTE" or "Tamil Tigers").  Tamils are a minority ethnic
group within Sri Lanka, and the LTTE, also known as the Tamil
Tigers, was founded in 1976 and uses illegal methods to raise
money, acquire weapons and technology and publicize its cause of
establishing an independent Tamil state in northern Sri Lanka.
The LTTE started its armed conflict against the Sri Lankan
Government in 1983, and has utilized a guerrilla strategy that
often includes acts of terrorism.  The LTTE controls most of the
northern and eastern coastal areas of Sri Lanka, but has
conducted operations throughout the island.  The LTTE has roughly
8,000 to 10,000 armed combatants in Sri Lanka, including 3,000 to
6,000 trained fighters.

3.   The group's elite Black Tiger squad is notorious
for its suicide bombings.  Over the past 15 years, the LTTE has

conducted roughly 200 suicide bombings.  Major recent terrorist attacks include: on June 15, 2006, the LTTE detonated a remote controlled claymore mine, blowing-up an overcrowded civilian bus and killing 64 people, including 15 children; on April 25, 2006, a female suicide bomber targeted Sri Lanka's top military commander, seriously wounding him and killing eight people; on July 7, 2004, a female LTTE suicide bomber blew herself up inside a police station in Sri Lanka's capital, killing five police officers and violating a two-year cease fire; on July 24, 2001, LTTE suicide bombers attacked Sri Lanka's main air base (and only international airport), killing 12 people and destroying 13 aircraft; on October 2, 2000, an LTTE suicide bomber killed 23 people, including a Muslim political candidate who was contesting parliamentary elections; on December 18, 1999, 38 people were killed by LTTE suicide bombers in two attacks on election rallies; and on January 25, 1998, LTTE suicide bombers attacked Sri Lanka's holiest Buddhist shrine and killed 16 people.

4.    The LTTE is also notorious for political assassinations, including the May 1991 assassination of former Indian Prime Minister Rajiv Gandhi; the 1993 assassination of the President of Sri Lanka, Ranasinghe Premadasa; the July 1999 assassination of Neelan Thiruchelvam, a member of the Sri Lankan parliament who was involved in a government-sponsored peace initiative; the attempted assassination of Sri Lankan President

6

Chandrika Kumaratunga in December 1999; and the June 2000
assassination of C.V. Goonaratne, the Sri Lankan Industry
Minister.

5. The LTTE and the Sri Lankan government have been
operating under a tenuous cease-fire agreement since 2002. In
the past several months, however, the agreement has fallen apart
almost entirely. On November 18, 2005, Mahinda Rajapakse was
elected Prime Minister of Sri Lanka. LTTE strongly opposes
Rajapakse, and on November 27, 2005, LTTE leader Velupillai
Prabhakaran issued an ultimatum that LTTE would intensify its
attacks in 2006 if Tamils were not given an independent homeland.
In the months following Prabhakaran's speech, the LTTE has
conducted numerous attacks, including the murder of 15 Sri Lankan
Army soldiers and three Muslim civilians in multiple attacks in
early December 2005, the abduction of three Sri Lankan Navy
sailors on December 22, the murder of several sailors on December
23 and, as noted, the targeting of Sri Lanka's top military
commander and murder of eight individuals on April 25, 2006.
Since April 2006, more than 500 people have been killed in the
escalating conflict. LTTE's recent attacks have been condemned
by the international community, including statements by the
United States State Department, United Nations Secretary General
Kofi Annan, the European Union and the Indian government.

6.    The LTTE relies heavily upon supporters in the United States, Europe, Canada, Australia and elsewhere to raise and launder money, acquire intelligence, purchase technology and military arms and equipment, and improperly influence elected politicians and other government officials.

7.    The LTTE has been designated by the United States State Department as a Foreign Terrorist Organization since 1997, and is banned in several other countries as well.  As such, the LTTE cannot legally raise money or procure operational equipment or other materials in the United States.  Individuals involved in these activities or other forms of material support are subject to federal prosecution under 18 U.S.C. § 2339B and other statutes.  The United States' designation of the LTTE as a terrorist organization has significantly hindered the LTTE's propaganda campaign to portray itself as a legitimate "liberation" movement for the Tamil population in Sri Lanka. However, rather than abandoning their terrorist tactics — suicide bombings targeting innocent civilians, assassinations of political figures, use of children as soldiers, etc. — to change its image in the international community, the LTTE has attempted to bribe its way off the Foreign Terrorist Organization list, has resorted to secret fundraising through front charitable organizations in the United States, and has relied upon supporters in the U.S. and U.S.-based e-mail accounts to acquire

operational equipment and technological know-how from illegal dealers and unsuspecting North American companies.

8.    The LTTE manages its worldwide operations through a hierarchical organizational structure.  As discussed, the head of the LTTE is Velupillai Prabhakaran.  Prabhakaran maintains close oversight over almost all aspects of the LTTE's worldwide activities.  S.P. Tamilselvan is the head of the LTTE's political wing.  Sanumganadan Sivashankar, also known as "Pottu Amman," leads the intelligence and operations wing.  Veerakathi Manivannan, also known as "Castro," is the LTTE's "International Communications Secretariat."

9.    Defendant FNU LNU, also known as "Thavarajah Pratheepan," "Raja Pratheepan," "Thambi Sampras" and "Steeban" ("PRATHEEPAN"), is a principal liaison between Prabhakaran and other LTTE leadership and LTTE supporters in North America, Europe and Asia, and is actively involved in procuring operational equipment from around the world.  Defendants MURUGESU VINAYAGAMOORTHY ("MOORTHY") and GASPAR RAJ MARIA PAULIAN ("GASPAR RAJ") are senior LTTE supporters who have direct and frequent contact with LTTE leadership in Sri Lanka and are often dispatched by the LTTE to countries around the world, including the United States, to facilitate LTTE projects.  MOORTHY and GASPAR RAJ serve as intermediaries between LTTE supporters in the United States, Europe and elsewhere and the Sri Lankan

leadership.   Defendants NAMASIVAYA VISWANATHAN, SURESH SRISKANDARAJAH, NACHIMUTHU SOCRATES, VIJAYSHANTHAR PATPANATHAN, also known as "Chandru," THIRUKUMARAN SINNATHAMBY, THIRUKUMARAN SIVASUBRAMANIAM and RAMANAN MYLVAGANAM are LTTE supporters in North America.

        10.   As discussed below, the defendants – and several others – are engaged in a far-reaching conspiracy to provide material support to the LTTE, in violation of 18 U.S.C. § 2339B. The defendants' material support consisted of the procurement of military equipment, communications devices and other technology, fundraising and money laundering through front charitable organizations, and a myriad of other criminal activity, including conspiracy to bribe public officials, attempting to obtain classified information, dealing in financial transactions with a designated Foreign Terrorist Organization, and money laundering, among other crimes.

II.    TARGETING OF UNITED STATES PUBLIC OFFICIALS

        A.    Bribery of Purported State Department
              Officials

        11.   Defendants MOORTHY, VISWANATHAN, SOCRATES, GASPAR RAJ, PRATHEEPAN and CHANDRU have resorted to bribery to persuade purported U.S. State Department officials to remove the LTTE from the Foreign Terrorist Organization ("FTO") list, disclose classified intelligence about the LTTE and enable the defendant VISWANATHAN to travel freely to and from the United States.

1.   Removal of Ban on LTTE

12.   In April 2004, LTTE senior leadership in Sri Lanka dispatched defendant GASPAR RAJ from India to New York to attempt to have the LTTE removed from the terrorist list.  Defendant CHANDRU helped to facilitate GASPAR RAJ's trip.  CHANDRU explained to a confidential informant ("CI-1")[2] that the LTTE "leader" had sent GASPAR RAJ to the United States to try to get the ban on the LTTE removed, and that GASPAR RAJ would be meeting with the "leader" again the next month, May 2004.  The conversation was consensually recorded and conducted in the Tamil language.  I have reviewed a draft summary translation.[3]

13.   GASPAR RAJ returned to the United States in June 2004.  On or about June 25, 2004, CI-1, CHANDRU and defendant NACHIMUTHU SOCRATES met GASPAR RAJ at Newark International

---

[2]   The government has been working with CI-1 since 1999.  CI-1 was convicted of a drug trafficking felony in the Eastern District of New York in 1994, and started working with the government while on supervised release for that conviction (with the approval of the Court).  In exchange for his cooperation, CI-1 has received INS parole documents enabling him to stay in the United States, as well as financial assistance.  To date, CI-1 has provided extremely credible information that has been corroborated by consensual recordings, e-mails, financial documents and review of public records.

[3] Unless otherwise specified, all conversations and meetings involving CI-1 were consensually recorded.  In conversations and meetings involving CI-1 and the defendants, the participants spoke primarily in the Tamil language.  The descriptions of those conversations are based on draft summary translations.  In meetings in which the purported U.S. government officials – UC-1, UC-2 and UC-3 – participated, the parties spoke primarily in English.

Airport in Newark, New Jersey. Three days later, CI-1 picked-up GASPAR RAJ at the Port Authority bus terminal in Manhattan, and the two drove to CI-1's residence in Staten Island. During the drive, GASPAR RAJ explained to CI-1 how he recently returned from a meeting in LTTE-controlled territory in Sri Lanka with the "leader," as well as Pottu Amman, a reference to Sanumganadan Sivashankar, head of the LTTE's intelligence and operations wing. At CI-1's apartment, GASPAR RAJ and CI-1 discussed the possibility of bribing CI-1's U.S. government sources to persuade the United States government to remove the LTTE from the terrorist list. GASPAR RAJ told CI-1 that he was serious about having the ban against the LTTE lifted, and instructed CI-1 to talk to his government sources about the plan's feasibility. CI-1 said that the main issue with his sources would be money. GASPAR RAJ identified potential financial contributors and arranged a meeting with a prospective contributor.

14. Between September 2004 and April 2005, defendant SOCRATES met with an undercover law enforcement officer posing as a purported State Department official, UC-1, five times at CI-1's apartment in Staten Island. The meetings took place on or about September 17, 2004, October 6, 2004, December 15, 2004, March 22, 2005 and April 19, 2005. Defendant VISWANATHAN accompanied SOCRATES to the September 17 meeting. During these meetings, SOCRATES, VISWANATHAN, UC-1 and CI-1 discussed in detail the

financial terms and conditions of the bribe to remove the United States' ban of the LTTE.  UC-1 made it clear that the LTTE would have to pay him millions of dollars to get the ban lifted. During some of these meetings, UC-1 and SOCRATES also discussed the sale of classified United States intelligence information to the LTTE.

15.  SOCRATES made interim bribery payments to UC-1. After the December 15, 2004 meeting, SOCRATES gave CI-1 a check for $500 to give to UC-1.  At the April 19, 2005 meeting, SOCRATES gave UC-1 $5,000 in cash "to prove that we are not empty handed every time."

16.  In July 2005, the LTTE again sent defendant GASPAR RAJ to New York to meet with the purported State Department official, UC-1, as well as with another undercover law enforcement officer posing as a more senior State Department official ("UC-2"), about the bribery.  GASPAR RAJ, SOCRATES, UC-1, UC-2 and CI-1 met at CI-1's Staten Island apartment on July 7, 2005.  Prior to the meeting, GASPAR RAJ emphasized to SOCRATES and CI-1 that he did not want the State Department officials to know that he was an LTTE representative; he wanted to characterize his involvement in terms of political support. During the meeting, the parties discussed financial terms of the bribery, including a $1 million up-front payment.  SOCRATES also inquired about whether UC-1 and UC-2 could stop the United States

government from sending arms to the Sri Lankan government, and whether UC-2 could provide intelligence about this issue.

17.  Defendants MOORTHY and PRATHEEPAN also became involved in the scheme to bribe State Department officials.  On or about August 9, 2005, defendant MOORTHY sent an e-mail to PRATHEEPAN, explaining that "the person who helped us get the man to come from A wishes to come.  He says he has some thing [sic] important needing to be discussed with Ty. . . . He probably plans to do this while I am there."  "The person" is a reference to VISWANATHAN, and "the man to come from A" is a reference to an individual who traveled to Sri Lanka from "A" - i.e., "America," - as discussed more fully in paragraphs 30-35 below.

18.  In September 2005, MOORTHY and VISWANATHAN traveled to Sri Lanka and met with LTTE leadership.  In late September 2005, the LTTE sent MOORTHY to the United States to meet with the purported State Department officials.  On or about September 29, 2005, MOORTHY, SOCRATES, UC-1, UC-2 and CI-1 met at CI-1's Staten Island apartment.  MOORTHY made it clear that he had traveled to the United States for the meeting on behalf of senior LTTE leadership in Sri Lanka, and that the LTTE "leader" - i.e., Prabhakaran - would make the ultimate decision as to how much the LTTE was willing to bribe the State Department officials to remove the LTTE from the terrorist list:

> Moorthy:  I'm not going to talk to the leader
> myself, straight.  There's no phone

communication. So it has to be passed to somebody else, and that person will pass over to him. [] And the decision will be between these three.

UC-2: Well, who, who would you go to that has enough weight to talk to the leader?

Moorthy: It is my weight transmitted to him. Nobody else has (UI).

UC-2: So you and in conjunction with the leader, are essentially making the decision.

Moorthy: I'm not making the decision, I'm passing the information to him and he makes the decision. [] I don't really make any decision at all and if he says, 'okay we have a million dollars a million dollars we can agree.'

UC-2: Well how do you you know, just from your own personal assessment, how do you feel about the idea?

Moorthy: I'll tell you a few things . . . Are they financially that muscular? I don't think they are that. So they may not agree to the magnitude. . . . They are very strict businessmen. . . .

UC-2: I understand that's good business that makes good sense. . . I won't make a move until I know that money is available.

19. The purported U.S. State Department officials repeatedly emphasized to MOORTHY that in order for the LTTE to be removed from the list of foreign terrorist organizations and, more importantly, remain off the list, the LTTE would have to renounce suicide bombings and the use of children as soldiers. MOORTHY tried to justify the LTTE's tactics and explained that if war broke out again, suicide bombings were inevitable:

As far as suicide bombing was concerned there
was no option . . . Even the people who are
sending them there or the people who are
going, is not because they just want to go
and destruct something.  They, their aim is a
goal.  Like the professor in Chicago, who
recently developed such study and he say,
they are working toward a goal.  Provided
that goal is achieved it will stop. . . . You
know, there's not peace – ceasefire tells us
to stop the suicide bombing; it's not our
intention to be suicide bombers but it is
forced upon us.  We have no other means . . .
But one of the things I happen to, I feel I
have to mention is, if you, in the event of
war happening, I think it is inevitable that
suicide bombing will be used.

20.  After the meeting, MOORTHY, SOCRATES and CI-1
discussed their next steps.  MOORTHY said that the most that
Prahbakaran would agree to was $1 million, and that it would have
to be a cash payment – no banks involved.  MOORTHY said that he
would go back to London and communicate to LTTE leadership in Sri
Lanka through his "channel."  MOORTHY also explained that in his
experience with LTTE leadership, "When you present something, you
get thousand questions.  Otherwise, if he [Prabhakaran] considers
this an important thing, he will say 'varalaam' [translation: 'it
can come.'] He will ask me if I could go and then I will have to
go in one day and meet him."

21.  Upon returning to London, MOORTHY promptly
contacted, via e-mail, his "channel," defendant PRATHEEPAN.  On
or about October 4, 2005, MOORTHY sent PRATHEEPAN an e-mail
including various payment alternatives for a bribery scheme.

Over the next few weeks, MOORTHY and PRATHEEPAN had several additional e-mail communications about the scheme.  On or about October 16, 2005, MOORTHY e-mailed defendant VISWANATHAN to update him on his communication with LTTE leadership: "I am in touch – giving replies for clarification.  I have raised a question as to the extent of seriousness and interest in getting involved which would dictate the further step like needing dirct [sic] discussions."  On or about October 21, MOORTHY sent VISWANATHAN another e-mail, explaining that, "Guidance is that it has to be a must and likelyhood [sic] of confiding is getting less.  The effort is likely to be fruitless due to the prevailing climate there."  On or about November 2, 2005, MOORTHY sent another e-mail to VISWANATHAN, explaining that "Sivaperuman has informed that the plan related to the visit I did is to be dropped for the moment."  MOORTHY, VISWANATHAN and others often refer to Prabhakaran as "Sivaperuman," which is a Hindu God.

### 2.   Classified TRO Document

22.   The defendants were determined to maintain and expand their illicit relationship with the purported State Department officials.  On or about December 2, 2005, SOCRATES met with UC-1 and CI-1 concerning the purchase of a purported classified intelligence document about the LTTE.[4]  Socrates and

---

[4] The document was not a genuine classified document.  It was created by the FBI for purposes of this investigation.

CI-1 gave UC-1 $1,000 in cash, and UC-1 permitted Socrates to view and take notes about the document, which references a joint investigation by the United States and a foreign government into the Tamil Rehabilitation Organization ("TRO"), a suspected LTTE front fundraising organization.  The document states that U.S. and foreign government authorities interviewed four TRO officers, and learned that TRO had transmitted a large sum of money from London to Sri Lanka.  The document further states that the U.S. authorities concluded that this information did not warrant continued investigation of the TRO in the United States, and that the investigation had ceased.

23.  The next morning, December 3, SOCRATES called VISWANATHAN to inform him about the meeting and the document.[5] They discussed offering UC-1 a $50,000 annual salary to provide additional information going forward.  On or about December 10, VISWANATHAN and SOCRATES called MOORTHY to relay to MOORTHY the information contained in the document.  SOCRATES, concerned about secrecy and their phones being tapped, asked MOORTHY whether he was in a "good place" and talking on a "random number."  MOORTHY told SOCRATES and VISWANATHAN to talk "in a hidden way."  VISWANATHAN then explained the contents of the document to MOORTHY.

_____

[5] All telephone conversations referenced herein in which CI-1 and/or UC-1 and UC-2 did not participate were intercepted pursuant to court-authorized wiretaps.

24.   During this call, VISWANATHAN and SOCRATES also talked to MOORTHY about establishing a "continuous, working relationship" with UC-1 to continue getting information.   They talked about the importance of being able to "get the information and send it over there" - to Sri Lanka - and that they needed to pay UC-1 so that "the merchandise will continue to come."   They also discussed the difficulty of passing information to the LTTE in Sri Lanka, and SOCRATES and VISWANATHAN suggested that MOORTHY should "go there" - to Sri Lanka - to correct the situation. VISWANATHAN asked MOORTHY whether decisions could be made without getting approval from Sri Lanka, but MOORTHY explained that "approval has to come from them . . . Either the one we talk with should obtain it or he should give it to that side."

### 3.   Classified Terrorist Watch List Document

25.   VISWANATHAN and SOCRATES also bribed UC-1 to give them a purportedly classified document concerning VISWANATHAN being listed on a United States terrorist watch list.   On or about January 8, 2006, U.S. Customs officials temporarily detained VISWANATHAN as he was trying to board a flight from Toronto, Canada to the United States.   VISWANATHAN immediately called SOCRATES to inform him what had happened.   SOCRATES then called CI-1, and they discussed contacting CI-1's "friend" - UC-1 - to find out why VISWANATHAN had been stopped.   After several telephone calls among VISWANATHAN, SOCRATES and CI-1, SOCRATES

met with UC-1 and CI-1 on February 18, 2006, in Staten Island.
SOCRATES gave UC-1 an envelope containing $1,000 cash, and UC-1
allowed SOCRATES to read a purported secret report on
VISWANATHAN, which detailed the circumstances of his detention.
UC-1 and SOCRATES discussed the document, and UC-1 told SOCRATES
that, going forward, VISWANATHAN should be able to travel without
getting detained.   SOCRATES then called VISWANATHAN, handed the
phone to UC-1, and UC-1 explained to VISWANATHAN the
circumstances of his detention.

III.   LTTE PROCUREMENT ACTIVITIES

26.   The LTTE purchases arms and other military
equipment, communications devices and other technology from
countries around the world.  As discussed, defendant PRATHEEPAN
is a principal LTTE procurement officer.  He has used several
U.S.-based e-mail accounts to purchase and/or inquire about,
among other items, military arms, unmanned aerial vehicles for
"jamming of radio and radar," submarine design, flight lessons,
cell towers, radio controller equipment, global positioning
system ("GPS") equipment, short wavelength radio equipment, radio
and satellite equipment, air traffic equipment, cameras,
computers and engineering publications.  As discussed below,
defendants SRISKANDARAJAH, SINNATHAMBY, SIVASUBRAMANIAM,
MYLVAGANAM, and MOORTHY, among several others, have facilitated
these transactions for PRATHEEPAN and/or other co-conspirators.

A.   <u>SURESH SRISKANDARAJAH</u>

27.   Defendant SURESH SRISKANDARAJAH, who resides in Canada, has assisted PRATHEEPAN and other LTTE officials in Sri Lanka in researching and acquiring, in the United States and elsewhere, aviation equipment, submarine and warship design software and communications equipment.

28.   SRISKANDARAJAH has used student couriers to smuggle items into LTTE-controlled territory.  On or about October 23, 2005, SRISKANDARAJAH e-mailed three students about their travel to Sri Lanka, and explained to them in explicit detail how to deceive Sri Lankan customs officials at the airport in Colombo about the purpose of their trip, how they would be transported up to LTTE-controlled territory, and how to smuggle the materials that SRISKANDARAJAH would provide to them – including books, "sparton compasses," a "javad gps receiver," an "RFMD computer boards kit," laptop computers and other items – past Sri Lankan army officials.  SRISKANDARAJAH explained, among other things:

> Here is the info you'll need . . . read it/
> print it/ delete this email afterwards.  It
> contains important info so read it all but
> don't share with others. . .
>
> [D]on't tell anyone besides your family about
> your departure; you idiots already told way
> too much people. . .
>
> Pack up properly!  There is lots of money
> being dumped on these things; pack
> smartly. . . Put the stuff I gave properly

and put teddies and chocolates to cover up
although they are not problematic; just
computer stuff. . .

When you land in Sri Lanka . . . [o]nly speak
in English near them [customs officials];
never speak in Tamil in front of singalese
guys.  So, tell customs guys you are here on
vacation and will travel around whole island
with your family. . . See Colombo address
below to give in customs form. . . When the
guy checks the boarding pass, just smile and
show him and tell him there's only personal
clothes and chocolates, etc (gifts for
family).  Give him a bag of chocolate.  If
they ask you what things are for: SAY it is
gift for family and try to make up some
BS. . .

When you get out of this part, you should see
Mayooran there. . . He will put you on a van
to Vanni [LTTE controlled territory].  Before
that, give him the things you need to give
him and pickup anything he gives (not sure if
he will give you anything yet). . .

From airport, you got about 8 hour journey to
Vanni. . .

You get to army checkpoint after vavuniya.
This is the most trickiest part but it is not
a problem at all. . . You will be asked to
take out the suitcases and open for them to
see.   Put the suitcases without any
problematic things in the back of the van
first; so when you have to take out the bags.
. take these out first. . . Give them like 1
bag of chocolate for all of them and smile.
Give cigarette too. . . If they ask about
anything; say they are gift for family; they
are computer parts.  Make up some BS. .
remember, speak in chilling way only in
English.  DO NOT tell these guys or at
airport that you are going to Vanni . . . do
not say vanni or kilinochchi [LTTE
headquarters].  Say you are just visiting
around family; nothing else; not helping; no
nothing else. . .

> Now you get to the tigers checkpoint, only 5
> minutes away. . . Tell them waterloo Suresh
> sent you and that you will be in vanni for 2
> months. . .
>
> In kilinochchi town, go to nanthavanam which
> is right beside the sports ground.  There,
> tell them waterloo Suresh sent you and you
> need to see Elil.  I need to know that you
> arrived safely and more importantly all the
> things got there safely ☺. . .
>
> Take everything to Vanni and give to Elil who
> will be your person there. . . [E]verything
> else give to Elil so he will distribute to
> people you will work with. . .

29.   SRISKANDARAJAH also facilitated the purchase of "towers" for PRATHEEPAN.  In an e-mail dated September 29, 2004, SRISKANDARAJAH told PRATHEEPAN that, "We're ready to buy the equipment, but still need to hear from you regarding . . . 1. height of towers (2) 2.  distance between towers   3.  would you be able to build a tower at the checkpoint, etc. .  4.  height of hill where tower 2 is located   Please call me to speak about this so that we can order the parts tomorrow."  In March 2005, SRISKANDARAJAH provided PRATHEEPAN with a contact at Raytheon Aircraft Company, a large military contractor.  By e-mail dated March 15, 2005,  SRISKANDARAJAH told PRATHEEPAN that the contact "[w]orks on air traffic radars.  He does talk a lot but does little . . . but see if he's of any use to you."

30.   Defendants SRISKANDARAJAH, SIVASUBRAMANIAN and SINNATHAMBY have also used U.S. based bank accounts to launder money for LTTE-funded activities, including the purchase of

operational equipment and travel to and from Sri Lanka. For example, in or about March 2005, SIVASUBRAMANIAN and SINNATHAMBY, in coordination with SRISKANDARAJAH, used their U.S. bank accounts to launder $13,150 in LTTE funds to pay for two individuals to travel to LTTE-controlled territory in Sri Lanka. Intercepted e-mail communications and consensually-recorded meetings reveal that Castro, the LTTE International Secretariat, in coordination with defendants MOORTHY and VISWANATHAN, orchestrated the payment from a Swiss bank account to the accounts used by SIVASUBRAMANIAM and SINNATHAMBY.

31. On or about March 17, 2005, VISWANATHAN received an e-mail from a New York travel agency which has its bank account at a JPMorgan Chase branch in Queens, New York. The e-mail related to a "Trip to Colombo" – Colombo is the capital of Sri Lanka – and explained that "the fare for these tickets are USD 6679 each." The e-mail also identified the travel agency's bank account number at JPMorgan Chase. On March 21, VISWANATHAN forwarded this e-mail to MOORTHY in London, telling him that "this is the info. for the tickets you wanted." MOORTHY, in turn, sent e-mails to Castro, who is the LTTE's International Communications Secretariat, with flight and ticket cost information concerning the trip, as well as the travel agency's bank account number.

32.  On or about March 24, MOORTHY sent Castro another
e-mail, asking, "Has the money for the ticket been transfered
[sic] already?"  MOORTHY sent Castro another e-mail, explaining
that "the ticketting [sic] agent is asking for eviden [sic] of
transfer.  Is it possible to provide some evidence?  Please ckeck
[sic] that the transfer has taken place and forward some
reference to Mr. Visvanathan [sic]."

33.  On or about March 27, MOORTHY sent an e-mail to
Castro, asking him to "Please again confirm with Europe whether
they have sent the money.  If they have - Get the detail to whom
- including he [sic] name of the bank, address of the bang [sic]
. . . and pass them to Mr. Visvanathan [sic] as soon as possible
today please."

34.  On or about March 28, 2005, defendant SURESH
SRISKANDARAJAH sent VISWANATHAN an e-mail explaining that "both
money is deposited . . $7150 from california And $6000 from
seattle They will both fax you right now."  VISWANATHAN then
received, via fax, copies of the wire transfer requests.
VISWANATHAN forwarded the wire transfer documents to the travel
agency in New York, and the travel agency sent an e-mail to
VISWANATHAN confirming that the airline tickets had been mailed
via "DHL" to VISWANATHAN.

35.  Analysis of the wire transfer requests and other
bank records reveal that the $13,150 was laundered as follows:

defendant SINNATHAMBY wired $7,180 to a travel agency's JPMorgan
Chase bank account in Queens, New York from his bank account at
Wells Fargo; defendant SIVASUBRAMANIAM wired $6,000 from a Bank
of America bank account to the travel agency's account in Queens,
New York; and two days later, the Wells Fargo and Bank of America
accounts were reimbursed by wire transfers from a UBS bank
account in Zurich, Switzerland.

        B.   <u>RAMANAN MYLVAGANAM</u>

       36.  In March 2006, defendants SRISKANDARAJAH and
MYLVAGANAM conspired to purchase approximately $22,000 of
submarine and warship design software from a U.K. company.
According to its website, the company was incorporated "under an
initiative from U.K. Central Government and U.K. Ministry of
Defence," and its "primary purpose was to enhance and make
commercially available a [60 million British Pound] MoD [Ministry
of Defense] development of Warship and Submarine design and
analysis software."  Based on the purchase order attached to an
e-mail sent by SRISKANDARAJAH to MYLVAGANAM, the software that
SRISKANDARAJAH and MYLVAGANAM arranged to purchase included a
"Solid Modeller" that, according to the company's website,
"enables the designer to create a solid model of a marine
vehicle," a program that "allows the designer to assess the
stability of a submarine," and other programs that enable a
designer to "perform dynamic simulations of submarine

manoeuvres," "analyze the structure of axisymmetric submarine pressure hulls," estimate "longitudinal weight distribution" during the design process and assess the power of a vessel using regression analysis.  SRISKANDARAJAH and MYLVAGANAM were concerned about questions regarding why they wanted to purchase military software.  In one e-mail, MYLVAGANAM advised SRISKANDARAJAH, "They are asking me a lot of questions.  I don't want to sound suspicious, so want to give them a good answer.  Please see if you can or whoever has a good idea about it to describe what we are going to use it for."  In response, SRISKANDARAJAH devised an elaborate scheme to make it appear as if the software was merely for a school project.

37.  SRISKANDARAJAH and MYLVAGANAM also attempted to purchase night vision equipment from a company in British Columbia, Canada.  To deceive the company, MYLVAGANAM told the company's representative that the products were for "a fourth year design project we are doing at our university."  MYLVAGANAM also assisted SRISKANDARAJAH in purchasing and shipping computer equipment, electronics components and communications equipment, and wire transferred over $5,000, at SRISKANDARAJAH's instruction, to two companies in Singapore that distribute smoldering equipment.

C.   THIRUKUMARAN SINNATHAMBY

38.   Defendant SINNATHAMBY, who used his bank account to launder funds from the LTTE, has also assisted PRATHEEPAN and SRISKANDARAJAH in purchasing technology.  By e-mail dated October 5, 2004, SINNATHAMBY provided PRATHEEPAN with three web sites and quotes for sourcing a short wave car radio antenna.  On or about January 17, 2005, Sinnathamby provided PRATHEEPAN, by e-mail, a quote of $2,749 for a Dell computer.  On or about March 15, 2005, Sinnathamby outsourced for PRATHEEPAN microprocessors from "IC Distributors," a source of electronic components and integrated circuits.  On or about October 28, 2005, SINNATHAMBY sent an e-mail to PRATHEEPAN with links to two web sites for United States companies for sourcing torches with LED technology.

39.   SINNATHAMBY also helped PRATHEEPAN establish accounts to purchase materials for the LTTE.  By e-mail dated February 9, 2004, SINNATHAMBY informed PRATHEEPAN of the "step by step" procedure for opening an account at Paypal.  Paypal is an account-based system that permits anyone with an e-mail account purchase materials online using a credit card or bank account. SINNATHAMBY also told PRATHEEPAN that, "What I'm telling you is that if you need anything, I can buy using my paypal account."

40.   Further, SINNATHAMBY, with the assistance of SRISKANDARAJAH, arranged to help smuggle scientific magazines to PRATHEEPAN in LTTE-controlled territory in Sri Lanka.  By e-mail

dated August 22, 2005, SINNATHAMBY told PRATHEEPAN that, "I have received a box of magazines just last week.  I will be handing over to Suresh [SRISKANDARAJAH] who always has volunteers coming to Vanni [LTTE-controlled area of Sri Lanka].  I will let you know who'll be taking the magazines."

    D. <u>THIRUKUMARAN SIVASUBRAMANIAM</u>

    41. Defendant SIVASUBRAMANIAM, in addition to using his bank account to launder money for the LTTE, has assisted SRISKANDARAJAH in procuring technology in the United States for the LTTE and laundering money for the purchases through different bank accounts.  In April 2006, for example, SRISKANDARAJAH, SIVASUBRAMANIAN, MYLVAGANAM and other co-conspirators acquired approximately $12,000 of technology from companies in the United States.  On or about April 29, 2006, SIVASUBRAMANIAM sent an e-mail to SRISKANDARAJAH detailing purchases that he and three other individuals had made.  SIVASUBRAMANIAM identified for SRISKANDARAJAH the "list of things I have paid for," and specified $1,000 for "Ramanam" (a reference to defendant RAMANAN MYLVAGANAM), amounts for other co-conspirators, and over $4,000 for "myself" – <u>i.e.</u>, SIVASUBRAMANIAM – which was for purchases of a "camera and case and battery," "labtop" [sic], "4 G memory card" and $250 for "my great service."  SIVASUBRAMANIAM told SRISKANDARAJAH that "I will deposit check for myself for that amount next week...  I will deposit check to [co-conspirator] on

Monday as well..."  On May 1, 2006, SIVASUBRAMANIAM sent a
follow-up e-mail to SRISKANDARAJAH, explaining that "I have
deposited $12520 into account.  And I also deposited $4700 into [
] account today... I hope you have money in your account..."

### D.   MURUGESU VINAYAGAMOORTHY

42.  Defendant MOORTHY has also facilitated purchases
for PRATHEEPAN, S.P. Tamilselvan, the head of the LTTE's
political wing, and others.  For example, in January 2004,
MOORTHY assisted PRATHEEPAN in purchasing Thuraya satellite
telephone "scratch cards" from Applied Satellite Technology.  In
addition, on or about November 12, 2004, MOORTHY e-mailed
Tamilselvan, explaining, "We are hoping to be there on [November
14, 2004].  We are hoping to sort out the things that were sent
through TRO when we are there."  In December 2004, MOORTHY e-
mailed PRATHEEPAN about several computers that had been purchased
for him and, apparently, taken to Sri Lanka during his
(MOORTHY's) trip there in November 2004.

43.  MOORTHY also maintains and manages several bank
accounts and credit cards for PRATHEEPAN in the U.K.

### IV.   LTTE FUNDRAISING IN NORTH AMERICA

44.  The defendants' conspiracy to provide material
support to the LTTE also includes fundraising in the United
States and Canada.  The LTTE relies on front charitable
organizations, including the Tamil Rehabilitation Organization

("TRO") and World Tamil Coordinating Committee ("WTCC"), among others, to give their fundraising activities the appearance of legitimacy.  The WTCC openly sells LTTE propaganda and literature on their websites, and have held fundraising events in which the featured speakers - with LTTE flags flying behind them on stage - openly called for those in attendance to support the LTTE.  As discussed above, these organizations are also used to smuggle goods to the LTTE in Sri Lanka.

45.   Defendant CHANDRU is affiliated with both TRO and the WTCC, and is an active LTTE fundraiser.  His phone number is listed as a New York contact on the TRO's website, and CHANDRU is the secretary of the WTCC.  CHANDRU has traveled to LTTE-controlled territory in Sri Lanka to meet with the senior leadership of the organization.  In or about October 2003, CHANDRU told CI-1 that, during his trip, he met the "leader," (a reference to Prabhakaran), as well as Castro, Balaraj (a reference to Colonel Balaraj, the head of the LTTE military wing), and Pottu Amman (a reference to Sanumganadan Sivashankar, head of the LTTE's Intelligence and Operations wing), among several others.  CHANDRU also said that he was supposed to meet with Colonel Soosai, a reference to Thamodarampillai Sivanesan, the commander of the Sea Tigers - the LTTE's navy - but that Soosai was busy and instead called CHANDRU on a cellular telephone.  CHANDRU told CI-1 that he told Colonel Soosai that he

wanted to go with him to the sea, and added, laughing, that
Soosai responded that they will train him and send him on the
next ship for a suicide mission.  CHANDRU also gave CI-1 a
detailed description of how he was covertly transported through
the jungles on a motorcycle to where the LTTE leaders resided.

46.  CHANDRU has acknowledged to CI-1 that he has
laundered money for the LTTE and that "we have sent millions"
through the TRO.  CHANDRU also detailed to CI-1 how the LTTE
raises money in the U.S. and Canada.  He said that, in total,
more money is raised in Canada, but that the LTTE relies more
heavily on donors in the United States for time-sensitive
financing needs.

47.  On or about June 25, 2004, CHANDRU told CI-1 about
being stopped by immigration officials for suspected money
laundering for the LTTE.  He explained that "the one time they
capture me for money [UI], I did not take money with me. . .
Before that I have taken money several times in several ways but
they never checked me and capture me.  For my luck, that day I
did not take any money."  CHANDRU also told CI-1 that, "from here
[U.S.], taking money out or bringing money in is not a big
problem," but that "sending money from Canada is a problem."
For this reason, CHANDRU said, "from the beginning (money) was
brought from there [Canada] to here [U.S.]."  CHANDRU also noted
that "after the money reaches the destination the people who are

32

involved in the process are ready for anything.  After the money has reached, we have no problem in going to the jail. . . One guy going to jail is better than the loss we incur by getting caught."

V.   ALIEN SMUGGLING

48.   Defendant CHANDRU and others have also conspired to bribe public officials to smuggle family members and associates into the United States from Sri Lanka.  In or about October 2001, CHANDRU and CI-1 met multiple times at CI-1's Staten Island apartment and elsewhere.  CHANDRU gave CI-1 photographs and biographical information for two aliens ("Alien 1" and "Alien 2") whom CHANDRU wanted to smuggle into the United States from Sri Lanka.  CHANDRU believed that CI-1 had a relationship with a corrupt INS officer ("UC-3") who could prepare fraudulently obtained I-512 forms[6] for the aliens for a bribery fee of $6,000 per alien.  The aliens could then use the forms to illegally gain entry into the United States.  Fraudently obtained I-512 forms were subsequently prepared and provided to CHANDRU to give to Aliens 1 and 2.

49.   On or about January 18, 2002, Alien 2 arrived at Newark International Airport via Singapore Airlines and was

---

[6]   INS Form 512 is entitled "Authorization for the Parole of an Alien into the United States."  When properly completed and approved by the INS, INS Form 512's grant advance parole into the United States to aliens, subject to inspection at the port of entry into the country.

paroled into the United States.  CHANDRU met CI-1 at the airport,
gave him $5,500 of the $6,000 bribery payment and said he would
pay the remaining balance at a later date.  On or about March 1,
2002, Alien 1 arrived at Newark International Airport via
Singapore Airlines and was paroled into the United States.
CHANDRU paid CI-1 the $6,000 fee for Alien 1.

50.  In or about February 2002, CHANDRU met CI-1 at his
Staten Island apartment and gave him the remaining $500 for Alien
2.  He also provided CI-1 with a FedEx envelope containing
biographical information and photographs for four additional
aliens ("Alien 3," "Alien 4," "Alien 5" and "Alien 6") to be
smuggled into the United States.   On or about March 15, 2002,
CHANDRU provided CI-1 with biographical information and
photographs for three more aliens ("Alien 7," "Alien 8," and
"Alien 9").  On or about April 4, 2002, fraudulently obtained I-
512 forms were issued for Alien 7, Alien 8 and Alien 9.  CI-1
gave CHANDRU the false I-512 forms for Alien 8 and Alien 9 on or
about April 7 and for Alien 7 on or about April 12.  Fraudulently
obtained I-512 forms were issued for Alien 4 and Alien 5 on or
about April 30, 2002.

51.  On or about May 10, 2002, Alien 5, Alien 7 and
Alien 9 arrived at Newark International Airport via Singapore
Airlines.  CHANDRU was at the airport and paid CI-1 $13,500 of
the $18,000 due for Alien 5, Alien 7 and Alien 9.  On or about

July 1, 2002, Alien 4 arrived at Newark International Airport via Singapore Airlines.  CHANDRU paid CI-1 $6,000 for Alien 4, as well as the remaining $4,500 balance due for Alien 7, Alien 8 and Alien 9.

52.  In or about March 2006, CHANDRU met with CI-1 and UC-3.  CHANDRU said that Alien 2 and Alien 4 were facing deportation proceedings in Buffalo, New York, and that CHANDRU was willing to pay UC-3 to stop their deportation.  UC-3 agreed to assist CHANDRU for $3,000.  On or about March 19, 2006, CHANDRU made a $1,400 payment to CI-1 to give to UC-3, and subsequently paid CI-1 the remaining balance.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for defendants FNU LNU, also known as "Thavarajah Pratheepan," "Raja Pratheepan," "Thambi Sampras" and "Steeban," SURESH SRISKANDARAJAH, also known as "Waterloo Suresh," THIRUKUMARAN SINNATHAMBY, THIRUKUMARAN SIVASUBRAMANIAM, MURUGESU VINAYAGAMOORTHY, also known as "Dr. Moorthy" and "Vinayagamoorthy Murugesu," VIJAYSHANTHAR PATPANATHAN, also known as "Chandru," GASPAR RAJ MARIA PAULIAN, also known as "Father Gaspar Raj," NAMASIVAYA VISWANATHAN, also known as "Visvanathan," NACHIMUTHU SOCRATES and RAMANAN MYLVAGANAM, so that they may be dealt with according to law.

Because of the nature and content of the charges alleged herein, the government requests that the complaint and arrest warrants be filed under seal until further order of this Court.

JAMES J. TARECO
Special Agent
Federal Bureau of Investigation

Sworn to before me this
18  Day of August, 2006

**KAM**

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK